

# NUMBER 13-22-00536-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**GRAHAM CONSTRUCTION SERVICES, INC.**
**AND TRAVELERS CASUALTY AND**
**SURETY COMPANY,**                                      **Appellants,**

**v.**

**CITY OF CORPUS CHRISTI,**                              **Appellee.**

---

## ON APPEAL FROM THE COUNTY COURT AT LAW NO. 2
## OF NUECES COUNTY, TEXAS

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Benavides and Silva**
**Memorandum Opinion by Chief Justice Contreras**

This case concerns the construction of a new wastewater treatment plant in Corpus Christi. Appellee/cross-appellant, the City of Corpus Christi (the City), hired appellant/cross-appellee Graham Construction Services, Inc. (Graham) to construct the plant, but various disputes arose, and the parties sued each other. After a bench trial, the

trial court found in favor of the City on some claims and in favor of Graham on others. Overall, with the opposing damages awards offset against each other, the final judgment awarded the City nearly $1.3 million. Graham and fellow appellant/cross-appellee Travelers Casualty and Surety Company (Travelers) challenge the trial court's judgment by two multifarious issues, and the City raises three issues on cross-appeal. We affirm in part and reverse and render in part.

## I. BACKGROUND

### A. The Contract

In 2009, the City hired general contractor Graham to replace the Broadway Wastewater Treatment Plant with a new facility. The parties executed a contract spanning over four thousand pages which included detailed technical specifications. The contract named Carollo Engineers, P.C. (Carollo) as the engineer of record and as the City's representative for purposes of administering the contract and observing the construction. Travelers provided a performance bond in favor of the City, as required by the contract and by statute.

According to the contract, the project was to be completed in two phases: Phase 1 included demolition of most of the old facility and construction of most of the new facility's infrastructure, while Phase 2 included the remaining work, such as the installation of two clarifiers intended to increase the new facility's capacity. The contract contained the following Paragraph 4.02 delineating the expected timeframe for completion of the phases:

2

|  | Substantial Completion | Completion |
|---|---|---|
| Phase 1 | 840 calendar days | 900 calendar days |
| Phase 2 (to commence upon substantial completion of Phase 1) | 200 calendar days | 260 calendar days |
| Total Contract Time | N/A | 1,100 calendar days |

In Paragraph 4.03, entitled "Liquidated Damages," the contract stated:

A.     [Graham] and [the City] recognize that time is of the essence of this Agreement, that Work under other contracts is dependent on the timely and satisfactory completion of the Work, and that [the City] will suffer financial loss if the Work is not completed within the times specified in paragraph 4.02, plus any extensions thereof allowed in accordance with Article 12 of the General Conditions. The parties also recognize that it will be impracticable to determine actual damages which [the City] will sustain in the event of or by reason of the delay. Accordingly, instead of requiring any such proof, [the City] and [Graham] agree that as liquidated damages for delay (but not as a penalty) [Graham] shall pay [the City] the following amounts for each day that expires after the specified time in paragraph 4.02 for substantial completion until the Work is substantially complete. . . . It is further agreed that the amount stipulated for liquidated damages per day of delay is a reasonable estimate of the damages that would be sustained by [the City], and [Graham] agrees to pay such liquidated damages as herein provided. . . .

| Item | Liquidated Damages, per calendar day |
|---|---|
| Phase 1 | |
|     Substantial Completion of the Work | $2,600 |
| Phase 2 | |
|     Substantial Completion of the Work | $2,600 |
|     Completion of all Work | $1,600 |

The contract further stated as follows in a document entitled "General and Supplemental Conditions":

3.04   *Amending and Supplementing Contract Documents*

3

A.     The Contract Documents may be amended to provide for additions, deletions, and revisions in the Work or to modify the terms and conditions thereof in one or more of the following ways: (i) a Written Amendment; (ii) a Change Order; or (iii) a Work Change Directive.

. . . .

6.18   *Continuing the Work*

A.     [Graham] shall carry on the Work and adhere to the progress schedule during all disputes or disagreements with [the City]. No Work shall be delayed or postponed pending resolution of any disputes or disagreements, excepts as permitted by paragraph 15.04 or as [the City] and [Graham] may otherwise agree in writing.

. . . .

14.04  *Substantial Completion*

A.     When [Graham] considers the entire Work ready for its intended use [Graham] shall notify [the City] and [Carollo] in writing that the entire Work is substantially complete (except for items specifically listed by [Graham] as incomplete) and request that [Carollo] issue a certificate of Substantial Completion. Promptly thereafter, [the City], [Graham], and [Carollo] shall make an inspection of the Work to determine the status of completion. If [Carollo] does not consider the Work substantially complete, [Carollo] will notify [Graham] in writing giving the reasons therefor. If [Carollo] considers the Work substantially complete, [Carollo] will prepare and deliver to [the City] a tentative certificate of Substantial Completion which shall fix the date of Substantial Completion. There shall be attached to the certificate a tentative list of items to be completed or corrected before final payment. [The City] shall have seven days after receipt of the tentative certificate during which to make written objection to [Carollo] as to any provisions of the certificate or attached list. If, after considering such objections, [Carollo] concludes that the Work is not substantially complete, [Carollo] will within 14 days after submission of the tentative certificate to [the City] notify [Graham] in writing, stating the reasons therefor. If, after consideration of [the City]'s objections, [Carollo] considers the Work substantially complete, [Carollo] will within said 14 days execute and deliver to [the City] and [Graham] a definitive certificate of Substantial Completion (with a revised list of items to be completed or corrected) reflecting such changes from the tentative certificate as [Carollo] believes justified after consideration of any objections from [the City].

. . . .

15.02 *[The City] May Terminate for Cause*

4

A.      If [Graham] refuses or fails to prosecute the Work . . . [the City] may without prejudice to any other right or remedy, serve written notice upon [Graham] and [Travelers] of [the City]'s intention to terminate the Contract. Such notice will contain the reasons for [the City]'s intention to terminate the Contract and unless such violations shall cease and satisfactory arrangements for the corrections thereof have been accepted by [the City] in writing within 20 days after the service of such notice, the Contract shall upon the expiration of said 20 days cease and terminate. In the event of such termination, the [City] shall immediately serve written notice upon [Travelers] and [Graham], and [Graham] shall be liable for all costs necessary to complete the Work.

. . . .

C.      Upon completion of the Work, if the unpaid balance of the Contract Price exceeds the direct and indirect cost of completing the Work, including, but not limited to, all costs incurred by [the City] from professional services and attorneys' fees and all costs generated to insure or bond the Work of substituted contractors or subcontractors used to complete the Work, such excess shall be paid to [Graham]. If such costs exceed the unpaid balance, [Graham] shall pay the difference to [the City] within 30 days upon demand; on failure of [Graham] to pay, [Travelers] shall promptly pay the difference to [the City] upon written notice of [Graham]'s failure of payment.

Finally, the contract stated as follows in "Specification 01324A":

1.22    ADJUSTMENT OF CONTRACT TIMES

A.      Contract time will be adjusted only for causes specified in the Contract Documents. Adjustments in the Contract time shall be governed by the principles of this Article . . . .

1.      Non-excusable delay: Actions or inactions of [Graham], or events for which [Graham] has assumed contractual responsibility (including actions or inactions of subcontractors, suppliers or materialmen at any tier) which would independently delay the completion of the Work beyond the current Contract completion date shall be designated as non-excusable delay. [Graham] shall not receive any time extension for such delays.

2.      Excusable delay: Events which are unforeseeable, outside the control of, and without the fault or negligence of either [the City] or [Graham] (or any party for whom either is responsible), which would independently delay the completion of the Work beyond the current Contract completion date shall be designated as excusable delay. [Graham] is entitled to a time extension only and shall not receive any other damages.

5

3.     Compensable Delay: Actions or inactions of [the City], or events for which [the City] has assumed contractual responsibility, which would independently delay the completion of the Work beyond the current Contract completion date shall be designated as compensable delay. [Graham] is entitled to a time extension and delay damages.

4.     Concurrent Delay: Concurrent delay is any combination of the above three types of delay occurring on the same calendar date(s), except in cases where the combination consists of two or more instances of the same type of delay occurring on the same calendar date(s). When one cause of delay is [City]-caused or caused by an event which is beyond the control and without the fault or negligence of either [the City] or [Graham] and the other [Graham]-caused, [Graham] is entitled only to a time extension and no delay damages.

## B.     The Litigation

Graham began work on the project in January of 2010. In March of 2013, Freese & Nichols, Inc. (FNI) replaced Carollo as the City's representative for purposes of observing the construction, though Carollo remained the engineer of record and retained its administrative responsibilities.

Despite several disputes and delays, the City was able to begin treating wastewater with ultraviolet (UV) disinfection at the new facility in March of 2014. In April of 2014, Graham requested that the City issue a Certificate of Substantial Completion for Phase 1, as contemplated in Paragraph 14.04 of the "General and Supplemental Conditions." On May 19, 2015, Carollo advised the City that Phase 1 had not been substantially completed, and so the City refused Graham's request for a certificate. Instead, it provided Graham with lists of issues which it claimed needed to be addressed before the certificate could be issued. Graham vacated the project site in late 2015 without performing Phase 2.

On May 2, 2016, Graham filed suit against the City for breach of contract, asserting it was entitled to damages for various delays allegedly caused by the City, including

6

delays attributable to the replacement of foundation piles, and for alleged cost overruns. The City filed a counterclaim on June 6, 2016, alleging that Graham breached the contract by failing to substantially complete either phase of the project, and a third-party claim against Travelers seeking to collect on the performance bond. Among other things, the City alleged in particular that the UV disinfection system which Graham installed in the new facility did not function properly. Graham's live petition named Carollo and the manufacturer of the UV disinfection system, Xylem Water Solutions USA, Inc. f/k/a ITT Water & Wastewater USA, Inc. d/b/a Wedeco (Wedeco), as additional defendants. The City filed a plea to the jurisdiction on governmental immunity grounds, but the trial court denied the plea and we affirmed. *City of Corpus Christi v. Graham Constr. Servs., Inc.*, No. 13-19-00367-CV, 2020 WL 3478661, at *3–4 (Tex. App.—Corpus Christi–Edinburg June 25, 2020, pet. denied) (mem. op.).

A bench trial took place over thirteen weeks from February to April 2022. Thirty-eight witnesses provided testimony and 2,690 exhibits were introduced. The trial court eventually rendered final judgment on September 2, 2022, awarding Graham $4,074,704.14 in damages against the City, and awarding the City $5,367,053.62 in damages against Graham and Travelers jointly and severally.[1] As detailed in the trial court's conclusions of law, Graham's damages consisted of: (1) $498,270 for "85 calendar days" of "schedule relief relating to [p]ile testing delays" at $5,862 per day; (2) $906,041.21 in "Direct Cost Damages" for certain items listed by Graham; (3) $2,297,904 for "392 days of [City]-caused compensable delays" at $5,862 per day;

---

[1] In the remainder of this opinion, we will refer to both appellants/cross-appellees collectively as Graham.

and (4) $372,488.93 in "withheld retainage." The City's damages were calculated by taking the reasonable and necessary cost for the City to complete Phase 2 ($9,321,211.59), and subtracting the undisputed balance due to Graham under the contract at the time the contract was terminated ($3,954,157.97). The total amount of the judgment, after the damages awards were offset, was $1,292,349.48 in favor of the City. The trial court also found that each party was liable for $1,860,000 in trial attorney's fees; therefore, those awards offset each other entirely.[2] Both parties perfected appeals from the final judgment.[3]

## C.    Findings and Conclusions

Subsequently, the trial court entered extensive findings of fact and conclusions of law. The findings of fact included the following:

On July 27, 2010, Graham engaged Wedeco to provide the UV disinfection system targeting *E. coli*.

In October 2010, after Wedeco made its first equipment submittal, Carollo advised that it was working to determine the ramifications of the more stringent discharge requirements promulgated by TCEQ [Texas Commission on Environmental Quality] which changed the target organism from *E. coli* to Enterococci. By that time, the piers for the original UV structure design had already been installed, and the footprint of the UV structure could not be changed.

On January 24, 2011, Carollo issued Request for Proposal (RFP) No. 2 to Graham to modify the UV system to meet these new requirements.

On February 23, 2011, Graham responded, providing cost and supporting documentation of $219,999.00 for Wedeco to provide additional UV equipment to meet the new regulatory requirement.

. . . .

---

[2] The final judgment also awarded both parties conditional appellate attorney's fees.

[3] The final judgment disposed of all claims brought by or against Carollo and Wedeco. Those entities are not parties to this appeal.

8

Effective July 27, 2011, Graham and the City entered into Change Order No. 1, which addressed, among other things, modifications to the UV system to target Enterococci. . . .

. . . .

By or about February 11, 2014, Graham had installed the majority of the Wedeco-supplied UV disinfection system. . . . Thereafter, the City commenced use of the UV disinfection system to disinfect wastewater.

In late March 2014, the City took over operations of the UV System after the commissioning testing was completed.

. . . .

On September 12, 2014, Graham claimed, in writing, that it had substantially completed Phase 1 as of April 4, 2014.

Between October 21, 2014[,] and October 23, 2014, Carollo evaluated the UV System.

On November 11, 2014, the City requested Carollo to evaluate Substantial Completion of Phase 1.

. . . .

On May 19, 2015, Carollo issued its opinion to the City that Graham had not achieved Phase 1 Substantial Completion. Attached to this correspondence were attachments identifying items needed to be completed. This correspondence and attachments were not provided to Graham.

. . . .

In late 2015, Graham demobilized and left the Project.

. . . .

On October 27, 2016, the City issued a Notice of Default and Demand to Cure to Graham and Travelers alleging a failure to complete an attached Phase 1 Substantial Completion punch list and a failure to complete Phase 2. . . . The Notice included the statement: "Of grave concern are the UV disinfection issues. This system has never worked properly."

Graham remobilized in November of 2016.

On November 4, 2016, Graham wrote the City that it would commence Phase 2, beginning with the demolition of the backwash filters. By letter

dated the same date, the City "directed" Graham "to suspend the proposed demolition," and Graham left the Project.

. . . .

On December 20, 2016, the City sent Graham and Travelers a Notice of Default and Termination purporting to terminate Graham for cause due to the UV disinfection issues and Graham's failure to prosecute Phase 2 work.

The conclusions of law included the following:

### Dispute Relating to Wedeco's UV Disinfection System

On December 2, 2016, the City counter-claimed against Graham and alleged, *inter alia*, that "[t]he UV disinfection system has failed and continues to fail to meet proper criteria for disinfection without the City supplementing this process with the chlorination process."

. . . .

[T]he Court finds that the City failed to meet its burden of proof of demonstrating by a preponderance of the evidence that the UV disinfection system did not "treat wastewater to the quality and in the quantity in accordance with the Contract Documents."

. . . .

### Phases of Work and Substantial Completion

. . . .

For Phase 1 of the work to be considered substantially complete, the following portions of the work had to be operational and ready for [the City]'s continuous use as intended:

    a.    Primary treatment systems (Headworks);

    b.    Secondary treatment systems (aeration basins and associated blower system, secondary Clarifiers Nos. 1 and 2);

    c.    Disinfection system (UV disinfection);

    d.    Aerated sludge tank and associated blower system;

    e.    Sludge dewatering system (centrifuges and associated pumps and polymer system);

    f.    Odor control systems; and

g.     Outfall rehabilitation/replacement.

For Phase 2 of the work to be considered substantially complete, the following portions of the work had to be operational and ready for [the City]'s continuous use as intended:

Secondary Clarifiers No. 3 and 4

The original date for Substantial Completion of Phase 1 was May 14, 2012; the date for Substantial Completion of Phase 2 was November 30, 2012; and the date for Final Completion was January 29, 2013.

By agreement and through Change Orders, Graham and the City agreed to extend the Project completion date by 159 calendar days so that: (1) Substantial Completion of Phase 1 was to be achieved by October 20, 2012; (2) Substantial Completion of Phase 2 was to be achieved by April 24, 2013; and (3) Final Completion of the entire Project was to be achieved by June 23, 2013.

Throughout the Contract Documents, "Substantial Completion" is described broadly as "complete and operational"; "sufficiently complete, in accordance with the Contract Documents, so that the work (or a specified part thereof) can be utilized for the purposes for which it is intended"; "operational and ready for the Owner's continuous use as intended"; or "can treat wastewater to the quality and in the quantity in accordance with the Contract Documents."

The Contract Documents contemplated that some work may still remain to be completed or corrected even though the [City] accepted the work and declared it to be substantially completed.

. . . .

Between April 4, 2014, when Graham claimed Substantial Completion of Phase 1; September 12, 2014, when Graham claimed in writing Substantial Completion of Phase 1; and for months afterwards, the City and Carollo alleged that there were Enterococci exceedances.

In its October 27, 2016, Notice of Default, the City claimed that the disinfection system failed to meet the proper criteria for disinfection without the City supplementing this process with chlorination.

. . . .

The evidence demonstrated that significant operations, maintenance, sampling, and testing problems at New Broadway likely caused or contributed to any Enterococci exceedances that may have occurred at the plant.

**Substantial Completion Lists**

Between December 15, 2014 and June 29, 2015, the parties circulated conflicting lists of items Graham needed to address in order to achieve Substantial Completion of Phase 1. Initially, Carollo's list identified approximately 1,300 items while FNI's list identified 800 items. During this time, Carollo was no longer tasked with construction observation. . . . After Carollo's observation services ended, the evidence shows an overall delay in moving the project forward and a decline in attention to detail, including, but not limited to, providing a list of items needed for Substantial Completion of Phase 1 and addressing the City's claims that the UV system was not meeting permit.

. . . .

The issue regarding what, if anything, needed to be completed on these competing lists was heavily disputed during the trial. The Court finds Graham's evidence most credible.

The Court finds that Graham achieved Substantial Completion of Phase 1 as of September 12, 2014[,] and that Graham's failure to achieve it by October 20, 2012 was excused . . . .

Ultimately, the court reached the following conclusions as to the parties' claims:

**Graham's Claims**

The Contract Documents include numerous provisions including a "time is of the essence" provision. The Contract Documents required the parties to submit specific documents or documentation in a particular manner within specific time periods. They also required the parties to perform certain acts. . . .

Despite these enumerated provisions and other contract provisions, the Court finds that none of the parties consistently:

> Followed the Contract Documents;

> Demanded that the other parties strictly follow the Contract Documents; or

> Enforced their rights under the Contract Documents when another party did not comply with the Contract Documents.

The Court finds that the City and Graham have waived any and all complaints based on untimely notice, untimely and incomplete requests for time and price adjustments, untimely/failure to provide certificates of

12

completion, objections to the substance and format of submitted documents, and similar complaints.

The Court finds that Graham's failure to comply with the contract's notice requirements was excused because the City waived compliance. Even without the Court's finding of waiver, Graham substantially complied with the notice provisions by keeping Carollo, FNI, and the City fully informed of the events that were adversely affecting the Contract time and costs.

. . . .

**Piles – Testing – Delays**

1.      On February 24, 2010, Graham submitted to Carollo[] RFP No. 1, requesting substitution of the auger cast piles specified for the Project with DeWaal piles.[4] On July 16, 2010, Carollo approved this request.

2.      The DeWaal Pile testing delays, which began within five months of the Project starting, caused a domino impact effect on Graham as all the critical paths of the Project ran through the piles.

3.      The Pile Integrity Testing (PIT) technician reported a multitude of anomalies. To further test the integrity of those piles with reported anomalies, those piles were excavated to see what the anomaly was and a pile dynamic analysis was conducted. The pile dynamic analysis testing proved that the piles were within tolerances. The excavated piles revealed that the piles were bulging, which was acceptable, as opposed to necking (narrowing), which would be unacceptable.

. . . .

5.      It was not until the piles in the UV area were excavated because they were installed at an at-grade elevation (i.e., at the ground surface) and they had to be cut down, did Carollo realize that there was bulging on every pile at approximately the same distance below ground. . . .

6.      Carollo viewed some of these anomalies in some of the piles as a delay outside of the control of Graham and the City. The Court agrees and finds by a preponderance of the evidence that the delays caused by the anomalies in some of the piles were outside the control of Graham and the City.

---

4 "The DeWaal Pile System is a drilled, full displacement, cast-in-place concrete pile installed by powerful, fixed mast drill rigs capable of applying high rotational torque and crowd forces to the unique DeWaal tool." *DeWaal Drilled Displacement Pile*, MORRIS-SHEA BRIDGE CO., https://morrisshea.com/portfolio-item/dewaal-drilled-displacement-pile-ddp/ (last visited Nov. 5, 2024).

7.	Because the City and Graham disagreed as to the responsibility for the delays, and the number of added contract days to which Graham was entitled due to the Pile testing delays, the City had Rene Aguilar of Carollo investigate Graham's claim. On June 29, 2011, Mr. Aguilar recommended giving Graham a total of 82 working days (114 calendar days) of schedule relief relating to Pile testing delays.

. . . .

9.	The Court finds that the City did not give Graham all 114 calendar days of schedule relief relating to the Pile testing delays.

10.	The supporting documentation for Change Order Number 2 specifically references 29 calendar days given back to Graham because of the PIT delays. The negotiated 114 calendar days minus the 29 calendar days attributed to the extensive PIT testing in Change Order 2, specifically Proposed Contract Modification Number 10 . . . , leaves 85 calendar days due to Graham.

11.	The court awards Graham 85 calendar days at $5,862.00 per day for a total of $498,270.00.

**Graham's Additional Claims**

Graham claimed the following damage-causing breaches:

a.	Extended Pipe Supports in Aeration Basins

b.	Damp Spot and Leak Repair

c.	Coating at Headworks

d.	Centrifuge and Hopper Issues

e	SS Expansion Joint on 30["] Air Line at ECR-1/Blower Building

f.	Headworks Screen Compactor

g.	Generator Conflicts

h.	Aeration Basin Conduit Routing

i.	Electrical Cable Tray Conflicts

j.	UV Building Junction Boxes

k.	Aeration Basin Coarse Bubble Support

14

The Court finds that Graham did not prove any compensable time or direct cost damages for its claims related to the generator, item "g" above.

The Court finds that Graham's Direct Cost Damages for items "a–f" and "h–k" above are: $906,041.21

The Court finds that Graham had 392 days of [City]-caused compensable delays. The Court finds that Graham should be compensated at the rate of $5,862.00 per day for a total of: $2,297,904.00

The Court finds that Graham failed to prove its alleged loss of productivity and impact claims. . . .

The Court finds that Graham is entitled to the withheld retainage: $372,488.93 . . . .

### The City's Claims/Damages

The City failed to meet its burden of proof that the UV disinfection system supplied by Wedeco and installed by Graham did not "treat wastewater to the quality and in the quantity in accordance with the Contract Documents."

### Substantial Completion/Liquidated Damages

The Court finds that Graham achieved Substantial Completion of Phase 1 as of September 12, 2014[,] and that Graham's failure to achieve it by October 20, 2012[,] was excused. Therefore, the Court finds that the City is not entitled to any liquidated damages.

### Cost to Complete Phase 1 Work

The Court finds that the City is not entitled to any of its alleged costs to complete, repair or replace any work performed by Graham under Phase 1. The evidence supports Graham's contention that Phase 1 work on the City/Carollo's list was completed and/or substantially completed.

### Chlorination and Other Costs

The Court finds that the City is not entitled to any of its alleged costs, including, but not limited to, chlorination, incurred by the City to operate the facility. The Court finds that the City's use of chlorination was not necessary to disinfect the effluent to meet the [E]nterococci limits in the applicable regulatory permits. The City relied on chlorination instead of addressing its significant operations, maintenance, sampling, and testing problems at New Broadway. All of these issues at New Broadway likely caused or contributed to any Enterococci exceedances that may have occurred at the plant.

**Phase 2**

Graham was required to complete the Project by completing two defined phases of work. Each phase was comprised of specifically identified parts or portions of the facility.

Substantial Completion of each phase constituted separate material obligations from each other, and from the obligation to achieve final completion of Graham's entire work on the Project.

The City reasonably expected completion of Phase 2.

Graham contracted to complete Phase 2.

Graham failed to perform and failed to cure its failure to perform Phase 2.

Graham asserts that it was excused from performing Phase 2 because the City failed to timely issue a Certificate of Substantial Completion for Phase 1. But as noted, the parties waived all complaints about untimely notice. Moreover, the Court finds that the City's certification of Substantial Completion of Phase 1 was not a condition precedent to Graham's commencing Phase 2.

Even if certification of Substantial Completion by the City was a condition precedent, which the Court does not find, Article 6.18 of the Contract required Graham to continue its work and adhere to the completion schedule during all disputes or disagreements with the City, including, but not limited to, commencing and completing Phase 2, while the parties attempted to resolve whether Phase 1 was substantially complete. . . .

The City's failure to issue a Certificate of Substantial Completion for Phase 1 was not a material breach of the Contract.

On November 4, 2016, in response to the City's October 17, 2016 Notice of Default, which demanded that Graham "initiate work to complete the Project within twenty days," Graham advised that on November 7, 2016, it would commence Phase 2, under protest. Graham advised that it would begin with the demolition of the backwash filter building. That same day, the City sent a letter to Graham, prohibiting Graham from proceeding with the demolition of the backwash filter building. This prohibition was not a directive to Graham over its means, methods, manners, and sequencing of the project. The City did not interfere with Graham's means, methods, manners, and sequencing of Phase 2. The Contract Documents allotted a staging area which did not include the area where the backwash filter and chlorination were located. Graham never requested an RFI or change order to allow the location of the backwash filter and chlorination to be used as a staging area. Therefore, the City had the right to send a letter prohibiting Graham from

16

proceeding with Phase 2 in the order sequenced by Graham. This did not excuse Graham from constructing Phase 2.

Graham's claim that this was a directive of means, methods, and sequencing was a pretext to avoid performing Phase 2 because Graham knew it could not complete Phase 2 within the agreed upon contract time or price.

The Court finds that Graham failed to comply with the General Contract by failing to prosecute and perform the work under Phase 2.

. . . .

After the presentation of the proposed reasonable and necessary cost to complete Phase 2, the Court finds that the reasonable and necessary cost to complete Phase 2 is $9,321,211.59. . . .

**Termination by the City**

. . . .

The Court finds that the City had the right to terminate Graham for "cause," upon written notice, including, but not limited to, the following reason: If Graham persistently failed to perform its work in accordance with the Contract Documents.

The Court finds that the City properly terminated Graham for cause.

## II.    STANDARD OF REVIEW & APPLICABLE LAW

"A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Tex. Outfitters Ltd., LLC v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). We review such findings for legal and factual sufficiency of the evidence. *See id.*; *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996). The trial court's conclusions of law and its application of law to the facts are reviewed de novo. *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002); *Perry v. Del Rio*, 66 S.W.3d 239, 257 (Tex. 2001).

In a legal sufficiency review, "we consider whether the evidence at trial would enable a reasonable and fair-minded fact finder to reach the verdict under review." *Gunn*

*v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018); *see City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 827.

> Evidence is legally insufficient to support a jury finding when (1) the record bears no evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact.

*Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017) (citing *City of Keller*, 168 S.W.3d at 810). When a party attacks the legal sufficiency of an adverse finding on an issue on which it has the burden of proof, that party must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001).

In a factual sufficiency review, "we consider, weigh[,] and examine all of the evidence which supports or undermines the finding." *Adams v. H & H Meat Prods., Inc.*, 41 S.W.3d 762, 770 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.) (citing *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989)). A party attacking the factual sufficiency of an adverse finding must demonstrate on appeal that the adverse finding is "so against the great weight and preponderance of the evidence that the judgment should be set aside." *Dow Chem. Co.*, 46 S.W.3d at 242.

Under either sufficiency standard, the trier of fact is the sole judge of witnesses' credibility and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). It is the province of the trial court in a bench trial to resolve conflicting evidence, and we must assume that it resolved all conflicts in

accordance with its fact findings. *Howeth Invs., Inc. v. City of Hedwig Vill.*, 259 S.W.3d 877, 894 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (citing *City of Keller*, 168 S.W.3d at 819–20).

To prevail on a breach of contract claim, a plaintiff must establish the following elements: "(1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018). We construe an unambiguous contract as a matter of law, seeking to enforce the intention of the parties as expressed therein. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005) (per curiam).

### III.   CITY'S CLAIMS

#### A.   Costs to Complete Phase 2

By its first issue, Graham contends the trial court erred by awarding over $9 million in damages to the City for the costs to complete Phase 2 for at least six reasons: (1) the City's issuance of a Certificate of Substantial Completion for Phase 1 was a condition precedent to Graham's obligations as to Phase 2; (2) Graham did not waive its contractual right to receive such a certificate; (3) the City breached the contract first, thereby excusing Graham's obligation to perform Phase 2; (4) the City did not incur the costs; (5) the City did not provide notice of its claim; and (6) the amount awarded was not reasonable and necessary. We consider the sub-issues in turn.

### 1. Condition Precedent

"In a contract with a condition precedent, performance of that condition precedent is an essential element of a plaintiff's breach of contract case." *Abrams v. Salinas*, 467 S.W.3d 606, 614 (Tex. App.—San Antonio 2015, no pet.). "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation"; on the other hand, a covenant is merely "an agreement to act or refrain from acting in a certain way." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010); *see Abrams*, 467 S.W.3d at 614. Breach of a covenant does not affect the enforceability of the remaining provisions of the contract unless the breach is material or is a total breach. *Solar Applications Eng'g, Inc.*, 327 S.W.3d at 108. The absence of conditional language such as "if," "provided that," or "on condition that" indicates that a provision should be construed as a covenant. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990).

Graham argues that the City's issuance of a Certificate of Substantial Completion for Phase 1 was a condition precedent to its obligation to perform Phase 2, and therefore, because the City never issued the certificate, that obligation was never invoked. Graham points to the timeframe chart contained in the contract, which stated that Phase 2 is "to commence upon substantial completion of Phase 1." It also refers to "Specification 01110," a portion of which stated:

> 1.08   EARLY OCCUPANCY OF PORTIONS OF WORK
>
> . . . .
>
> B.   Certificates of Substantial Completion will be executed for each designated portion of Work prior to [the City's] occupancy.
>
> > 1.   Such certificates of Substantial Completion will describe the portion of the Work to be occupied by [the City], items that may be

20

> incomplete or defective, date of occupancy by [the City], and other
> information required by [the City] and [Graham].

Graham argues that this provision "makes clear that the City had no discretion to deny a certificate for work that was substantially complete."

Graham contends that "[c]ontractual provisions like this, which call for one party to provide 'a particular form of notice' before the other party would be required to proceed with its contractual obligations, are prototypical conditions precedent, especially in construction contracts." It cites several cases which it claims support this proposition. *See James Constr. Grp., LLC v. Westlake Chem. Corp.*, 650 S.W.3d 392, 409 (Tex. 2022) ("[B]arring waiver, when a contract requires written notice as a condition precedent to the right to enforce an obligation under the contract, substantial compliance with that requirement may not be achieved in the absence of a writing."); *Emerald Forest Util. Dist. v. Simonsen Constr. Co.*, 679 S.W.2d 51, 54 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.) ("When a contract provides for a particular form of notice, compliance with such provisions is a condition precedent to invoking the contract rights which are conditioned on the notice."); *Cimarron Dev. Corp. v. Daugherty*, 779 S.W.2d 952, 953 (Tex. App.—Corpus Christi–Edinburg 1989, no writ) ("The promissory note in the principal amount of $50,000.00 was based upon the condition precedent that appellees would complete the Cedar Creek project and furnish appellant with a certificate of completion."); *Middle States Petroleum Corp. v. Messenger*, 368 S.W.2d 645, 650 (Tex. App.—Dallas 1963, writ ref'd n.r.e.) ("There is an obligation on the part of the assignor to assume the burden of showing by a preponderance of the evidence that he has complied with his contractual [duties] before he may enforce the recovery of the land by court decree. Many cases uphold the validity of such conditions precedent relating to reasonable notice in oil

and gas leases."); *Slaughter v. Crisman & Nesbit*, 152 S.W. 205, 209 (Tex. App.—San Antonio 1912, no writ) ("When the parties agree on written notice, they are entitled to rely upon same, and in the contingencies provided for by the contract no delay should be allowed for unless the notice was given as provided by [the contract]."); *see also Kiewit Offshore Servs., Ltd. v. Dresser-Rand Glob. Servs., Inc.*, No. CV H-15-1299, 2016 WL 4564472, at \*5 (S.D. Tex. Sept. 1, 2016) ("Texas law supports Kiewit's position that a notice provision functions as a condition precedent.").

These cases are not persuasive as to the issue before us. The courts therein were not called upon to interpret contract language to determine whether a given provision was a condition precedent or a covenant; instead, the status of the contractual provision as a condition precedent was undisputed or assumed in those cases. *See James Constr. Grp., LLC*, 650 S.W.3d at 398 ("To terminate under Section 21.3, Westlake was required to give James three notices . . . ."); *Emerald Forest Util. Dist.*, 679 S.W.2d at 54 (noting that a notice provision is a condition precedent only to invoking "contract rights *which are conditioned on the notice*" (emphasis added)); *Middle States*, 368 S.W.2d at 650 (noting that, under the unambiguous contract at issue, "certain conditions precedent must be complied with before [the assignor] may demand enforcement of the condition subsequent requiring re-assignment of the property"); *Kiewit Offshore Servs., Ltd.*, 2016 WL 4564472, at \*5 ("[Appellee] has not disputed that the Contract's notice provision is accurately characterized as a condition precedent.").

Graham further argues that "Section 1.08's provision stating that Phase 2 would begin '*upon* substantial completion' of Phase 1[5] is classic conditional language, just like

---

[5] In fact, the provision stating that Phase 2 is "to commence upon substantial completion of Phase

22

the phrase '[h]e will receive his degree *upon completion* of his studies' signifies that he will receive his degree only on the condition that he completes his studies." It contends that the trial court's decision to the contrary is "inconsistent with the 'contract as a whole.'" *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (noting that, in construing a contract, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless," and "[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument"). Finally, Graham notes that when it asked the City to issue the certificate in April of 2014, the City disagreed that Phase 1 had been substantially completed but never "suggest[ed] . . . that Graham must proceed to Phase 2" without the certification. Graham argues that this behavior is evidence that the parties treated the provision as a condition precedent.

We disagree. Paragraph 14.04 of the "General and Supplemental Conditions" set forth the contractual requirement pertaining to certificates of substantial completion, but it did not state explicitly or implicitly that Graham's obligation to perform Phase 2 was conditioned on the City's issuance of a certificate of substantial completion for Phase 1. Similarly, though Section 1.08 of "Specification 01110" stated that a certificate of substantial completion must be issued "prior to [the City's] occupancy" of any "designated portion of Work," it did not state or imply that Graham's obligations as to any successive "portion of Work" were contingent on the City's issuance of a certificate. To the contrary, Paragraph 6.18 of the "General and Supplemental Conditions" broadly and generally

---

1" appears only in the timeframe chart, which is part of Paragraph 4.02A—not Section 1.08 of "Specification 01110."

23

stated that Graham "shall carry on the Work and adhere to the progress schedule during all disputes or disagreements" with the City, including a dispute regarding whether any phase of work had been substantially completed.

The only arguable "conditional language" in the contract identified by Graham is the language within the timeframe chart explaining that Phase 2 is "to commence upon substantial completion of Phase 1." But even assuming this language gives rise to a condition precedent and controls over Paragraph 6.18 of the "General and Supplemental Conditions," it merely provides that Graham's obligations as to Phase 2 are contingent on Phase 1 *actually being substantially completed*—not on the City's subsequent certification of that fact. In its reply brief, Graham acknowledges that the "event" which needed to occur to invoke its Phase 2 obligations "was the substantial completion of Phase 1" itself, not the City's issuance of a certificate.[6] That would be consistent with the language in the timeframe chart. But Graham asserted as early as April of 2014 that Phase 1 was substantially complete, and the trial court found it was substantially complete as of September 12, 2014.[7] Therefore, even assuming the language in the timeframe chart constitutes an enforceable condition precedent, the plain meaning of that language should have made it absolutely clear to Graham that its Phase 2 obligations had been invoked and were operable in September of 2014 at the latest.

Graham points to no other "conditional language" indicating that the parties intended for the City's issuance of a certificate to be a condition precedent to Graham's

---

[6] This contradicts Graham's initial brief, which argued exclusively that the "event" which would trigger its contractual obligation to perform Phase 2 was *the City's certification of substantial completion* as to Phase 1.

[7] Neither party contests this finding on appeal.

continued performance. *See Solar Applications Eng'g, Inc.*, 327 S.W.3d at 109 (noting that, "[w]hen no conditional language is used and another reasonable interpretation of the contract is possible, 'the terms will be construed as a covenant in order to prevent a forfeiture'") (quoting *Criswell*, 792 S.W.2d at 948); *PAJ, Inc. v. Hanover Ins.*, 243 S.W.3d 630, 636 (Tex. 2008) ("Conditions are not favored in the law; thus, when another reasonable reading that would avoid a forfeiture is available, we must construe contract language as a covenant rather than a condition.").

Finally, neither party has suggested that the contract is ambiguous with respect to the certificate requirement or Graham's obligations as to Phase 2. *See Kachina Pipeline Co. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) ("If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous."). Thus, even if there was evidence that the City treated the former as a condition precedent to the latter, that evidence would not be probative to our analysis, which concerns only the intent of the parties at the time the contract was executed. *See id.* (noting that "while evidence of circumstances can be used to inform the contract text and render it capable of only one meaning, extrinsic evidence can be considered only to interpret an ambiguous writing, not to create ambiguity" (internal quotation omitted)); *Friendswood Dev. Co. v. McDade & Co.*, 926 S.W.2d 280, 283 (Tex. 1996) (per curiam) ("Only after a contract is found to be ambiguous may parol evidence be admitted for the purpose of ascertaining the true intentions of the parties expressed in the contract."); *see also Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) ("Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered.").

For the foregoing reasons, we conclude that the trial court did not err in determining that the City's issuance of a certificate of substantial completion for Phase 1 was not a condition precedent to Graham's obligations as to Phase 2. We overrule this sub-issue.[8]

## 2.      Prior Material Breach

Graham next argues that its performance under the contract was excused because the City materially breached it first, and that the trial court erred by failing to so find. Specifically, Graham contends that the City materially breached the contract by (1) failing to issue a certificate of substantial completion for Phase 1, and (2) "wrongfully interfer[ing] with Graham's means and sequencing" concerning the project.

"It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (quoting *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004)). Several factors are considered in determining whether a breach is material, including:

(a)    the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b)    the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c)    the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d)    the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; [and]

---

[8] In light of this conclusion, we need not address Graham's sub-issue challenging the trial court's finding that it "waived any and all complaints based on . . . untimely/failure to provide certificates of completion." *See* TEX. R. APP. P. 47.1.

(e)    the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*Mustang Pipeline Co.*, 134 S.W.3d at 199 (citing RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)).

Graham's contention that it is excused from performance due to a prior material breach by the City is an affirmative defense to the City's breach of contract claim, on which Graham bore the burden of proof at trial. *Blackstone Med., Inc. v. Phoenix Surgicals, L.L.C.*, 470 S.W.3d 636, 646 (Tex. App.—Dallas 2015, no pet.); *see Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006) (referring to prior material breach as an affirmative defense to a contract claim); *see also* TEX. R. CIV. P. 94. Therefore, to obtain reversal, Graham must show on appeal that the evidence established the defense as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241.

We have already held that the City's issuance of a certificate of substantial completion for Phase 1 was not a condition precedent to Graham's obligations to continue the project. We further conclude that the City's failure to issue a certificate of substantial completion for Phase 1 was not a "material breach" of the contract excusing Graham's future performance.

Paragraph 14.04 of the "General and Supplemental Conditions" set forth that, when Graham considered its work to be "ready for its intended use," it was required to notify the City and to request that Carollo issue a certificate of substantial completion. At that point, the contract called for an inspection of the work to determine "the status of completion." If Carollo found that the work was substantially complete, the City had the opportunity to object, and Carollo would then make a decision on any objection. On the other hand, if Carollo found that the work was not substantially complete, Carollo was

27

required to inform Graham of that finding and the reasons therefor, but the City's obligation to issue a final certificate would not yet be invoked in that situation. Here, the trial court found that Graham claimed substantial completion of Phase 1 on September 12, 2014; the City asked Carollo to determine the status of completion on November 11, 2014; and Carollo issued its opinion to the City on May 19, 2015, that Phase 1 was not substantially complete. Graham does not challenge these findings on appeal. The City's obligation to issue a certificate of substantial completion for Phase 1 was therefore never invoked, and its failure to comply with that obligation did not constitute a breach of contract, material or immaterial.

Moreover, as previously noted, Paragraph 6.18 of the "General and Supplemental Conditions" required Graham to continue its work on the project during any dispute or disagreement with the City, including any dispute concerning whether Phase 1 had been substantially completed. Under these circumstances, the City's failure to issue a certificate of substantial completion for Phase 1 did not deprive Graham of any anticipated benefit, cause Graham to suffer forfeiture, or violate standards of good faith and fair dealing. *See Mustang Pipeline Co.*, 134 S.W.3d at 199; *see also Phila. Indem. Ins. v. White*, 490 S.W.3d 468, 471 (Tex. 2016) ("Texas's strong public policy favoring freedom of contract is firmly embedded in our jurisprudence. Absent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered."). Accordingly, even if the City's failure to issue a certificate of substantial completion for Phase 1 breached the contract, it was not a material breach that would excuse Graham's further performance.

Graham also argues that the City materially breached the contract first by "prohibiting Graham from commencing Phase 2 in the means, manner, and sequence that Graham had planned." The trial court found that, on November 4, 2016, Graham advised the City that it would commence Phase 2 "beginning with the demolition of the backwash filters" at the original plant. Believing that the newly-installed UV system was defective and that the backwash filter area would need to be used for chlorination purposes, the City replied to Graham in a letter that same day stating: "If Graham is proposing to demolish the old plant's backwash filter, Graham is directed to suspend the proposed demolition." Graham notes that, under Paragraph 3.04 of the "General and Supplemental Conditions," if the City wished to "order additions, deletions, or revisions in the Work," it could do so only pursuant to a "Written Amendment," a "Change Order," or a "Work Change Directive." Graham argues that the City's November 4, 2016 letter constituted a material breach of this provision as well as Paragraph 6.01 of the "General and Supplemental Conditions," which provided that Graham was "solely responsible for the means, methods, techniques, sequences, and procedures of construction."

Again, we cannot conclude that the City's November 4, 2016 letter constituted a "material breach" that would excuse Graham's performance of Phase 2. Paragraph 3.04 of the "General and Supplemental Conditions" set forth three methods by which the contract may be amended, but it did not explicitly state that those methods were exclusive. Even if these were the exclusive means to amend the contract, the City's direction to "suspend the proposed demolition" was not an "addition[], deletion[], or revision[]" in the work, but was merely a delay that the City believed was necessary due to alleged issues with the UV system installed at the new facility. Further, the City's letter did not deprive

29

Graham of its contractual right to determine the "means, methods, techniques, sequences, and procedures of construction." The fact that the City ordered Graham to "suspend" one element of Phase 2 does not mean that Graham could not perform that element, or any other element of Phase 2, using its chosen methods and sequencing.[9] Finally, even assuming that the City's November 4, 2016 letter breached the contract, Graham does not offer any argument for why this breach would be "material" so as to excuse its future performance. *See* TEX. R. APP. P. 38.1(i). It is again noteworthy that Paragraph 6.18 of the "General and Supplemental Conditions" required Graham to continue working on the project during any dispute or disagreement with the City, including any dispute concerning the sequencing of Phase 2.

The evidence did not establish as a matter of law that Graham was excused from performance due to any prior material breach by the City. *See Dow Chem. Co.*, 46 S.W.3d at 241. We overrule this sub-issue.

### 3. Incurring of Costs

By the next part of its first issue, Graham argues that "[t]he City cannot recover its costs to complete Phase 2" because the City did not "actually hav[e] the Phase 2 work performed" nor did it "incur[] actual costs for doing so."[10]

Graham's argument is based on Paragraph 15.02(c) of the "General and Supplemental Conditions," which provides that if the City terminates the contract and completes the work itself, and the "cost of completing the Work" exceeds the "unpaid

---

[9] The City observes that the schedules submitted by Graham as required by the contract did not state that construction of Phase 2 would begin with demolition of the backwash filters.

[10] The City argues Graham failed to preserve this sub-issue for appeal because it was not raised in the trial court. *See* TEX. R. APP. P. 33.1(a)(1). We assume but do not decide that the sub-issue is properly before us.

30

balance of the Contract," then Graham is required to "pay the difference to [the City] within 30 days upon demand." Graham notes that, under that paragraph, "cost of completing the Work" includes "all costs incurred by [the City] from professional services and attorneys' fees and all costs generated to insure or bond the Work of substituted contractors or subcontractors used to complete the Work." It suggests that, under this language, the City is only able to recover sums which it "incurred"—and it argues that the City did not "incur" any costs in this case because it did not do any work on Phase 2.

We disagree. By its own terms, Paragraph 15.02(C) of the "Supplemental Conditions" applies only "[u]pon completion of the Work," and Graham concedes that "the City has never even commenced Phase 2" by itself. Graham points to nothing in the contract stating that, if Graham fails to complete certain work as required by the contract, the City must complete that work itself before seeking damages for Graham's breach. Moreover, Paragraph 15.02(C) does not purport to be the exclusive means by which a party may recover damages for breach.[11] In any event, Paragraph 15.02(C) states that the City is entitled to its "direct and indirect cost[s]" which "includ[es], but [is] not limited to, all costs incurred." Thus, even if this provision applies to the City's request for cost-of-completion damages, it does not restrict the recoverable damages only to those "incurred" by the City. Instead, the City was entitled under the common law to recover consequential damages for Graham's failure to complete Phase 2. *See Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 164 (Tex. 1982) (noting that, "[f]or breach of a

---

[11] Notably, Paragraph 17.03(A) of the "General and Supplemental Conditions" states:

The duties and obligations imposed by these General Conditions and the rights and remedies available hereunder to the parties hereto are in addition to and are not to be construed in any way as a limitation of, any rights and remedies available to any or all of them which are otherwise imposed or available by Laws or Regulations, by special warranty or guarantee, or by other provisions of the Contract Documents.

construction contract, if the contractor has substantially performed, the owner can recover the cost of completion less the unpaid balance on the contract price. We will refer to this as the remedial measure of damages"); *see also Signature Indus. Servs., LLC v. Int'l Paper Co.*, 638 S.W.3d 179, 186 (Tex. 2022) ("Damages for breach of contract may include both direct and consequential damages."). This sub-issue is overruled.

### 4. Notice of Claim

Graham also argues by its first issue that "[t]he City cannot recover its costs to complete Phase 2" because the City "never submitted a claim under the Contract's claim-submittal provision." Paragraph 10.05 of the "General and Supplemental Conditions" states:

> 10.05 *Claims and Disputes*
>
> A. *Notice*: Written notice stating the general nature of each Claim, dispute, or other matter shall be delivered by the claimant to [Carollo] and the other party to the Contract promptly (but in no event later than 30 days) after the start of the event giving rise thereto. Notice of the amount or extent of the Claim, dispute, or other matter with supporting data shall be delivered to [Carollo] and the other party to the Contract within 60 days after the start of such event (unless [Carollo] allows additional time for claimant to submit additional or more accurate data in support of such Claim, dispute, or other matter). . . . The opposing party shall submit any response to [Carollo] and the claimant within 30 days after receipt of the claimant's last submittal (unless [Carollo] allows additional time).
>
> . . . .
>
> D. . . . . No Claim for an adjustment in Contract Price or Contract Times (or Milestones) will be valid if not submitted in accordance with this paragraph 10.05.

Graham argues that the City "provided Graham with no written notice whatsoever."

In response, the City observes that "Claim" is defined in the contract as "[a] demand or assertion by [the City] or [Graham] seeking an adjustment of Contract Price or Contract Times, or both, or other relief with respect to the terms of the Contract." The

City asserts that neither its termination of the contract nor its request for remedial damages constitute "an adjustment of Contract Price or Contract Times" requiring prior written notice under Paragraph 10.05. We agree. The "claim" which the City asserted in its lawsuit, and for which the trial court awarded over $9 million in damages, was that Graham failed to perform Phase 2 of the project—it did not involve a requested change in the price or timeframes set forth in the contract. Accordingly, Paragraph 10.05(D) did not operate to render the City's suit invalid. Further, even if the City's suit constituted a "claim" for purposes of Paragraph 10.05(A) because it sought "other relief with respect to the terms of the Contract," there is nothing in the contract indicating generally that such a "claim" is invalid if notice of the claim is not provided as contemplated in Paragraph 10.05(A). Significantly, Graham does not argue that the City's compliance with the notice requirement in Paragraph 10.05(A) was a condition precedent to the City's suit, or that the City's failure to comply with that requirement excused Graham's performance with respect to Phase 2. *See* TEX. R. APP. P. 38.1(i).

In any event, the trial court found that both parties "waived any and all complaints based on untimely notice." *See Jernigan v. Langley*, 111 S.W.3d 153, 156 (Tex. 2003) ("Waiver is defined as 'an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right.'" (quoting *Sun Expl. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987))). Although Graham disputes the trial court's waiver finding with respect to the City's issuance of a certificate of substantial completion of Phase 1, it does not dispute that the evidence supported the waiver finding with respect to "untimely notice."[12] Thus, even if the contract ostensibly barred any claim of which prior

---

[12] The City observes that, at trial, it argued that Graham materially breached the contract first by

33

notice was not provided, that would not bar the City's recovery in this instance. We overrule this sub-issue.

### 5. Amount of Costs

In the last part of its first issue, Graham contends that the City did not prove that $9,321,211.59 was reasonable and necessary for the completion of Phase 2.

A party seeking to recover remedial damages for breach of a construction contract must prove that the damages sought are reasonable and necessary. *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012) (citing *Mustang Pipeline Co.*, 134 S.W.3d at 200). To establish that, the plaintiff must show more than simply "the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefor." *Id.* (citing *Dall. Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 383 (1956)). Instead, some other "evidence showing that the charges are reasonable" is required. *Id.* In *Mustang Pipeline*, for example, the plaintiff's expert estimated the cost for a new company to complete the contract but did not opine about "whether that contracted amount was a reasonable cost to build a pipeline." *Id.* The Texas Supreme Court noted that "proof of the amounts charged or paid" does not alone establish that the damages were reasonable and necessary. *Id.*

---

failing to provide timely notice of delays during Phase 1. In response, Graham argued that the notice requirements in the contract had been waived because the parties were not following them. The trial court agreed with Graham, finding that neither party consistently "[f]ollowed the Contract Documents," "[d]emanded that the other parties strictly follow" those documents, or "[e]nforced their rights" under those documents when another party did not comply. Thus, to the extent that Graham now challenges the court's waiver finding, it is estopped from doing so. *See Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 861 (Tex. 2005) ("As a general rule, the doctrine of estoppel precludes a litigant from requesting a ruling from a court and then complaining that the court committed error in giving it to him."); *Arreola v. Union Pac. R.R.*, 657 S.W.3d 789, 816 (Tex. App.—El Paso 2022, no pet.) (noting that "[u]nder the invited error doctrine, a party cannot complain on appeal that the trial court took a specific action that the complaining party requested" (internal quotation omitted)).

Scott Hibbs, an expert retained by the City, testified that he is the president of a civil engineering firm and has designed around thirty-five water and wastewater treatment plants. Hibbs visited the project site in 2017 and evaluated what work was necessary to complete Phase 2 based on "reasonable scientific and engineering probability." Another expert retained by the City, Brandon Ballengee, testified that he previously managed the estimating department at a construction firm and has provided estimates on "hundreds" of water and wastewater projects. He said Hibbs asked him to "give a reasonable and necessary cost to construct the clarifiers 3 and 4 and the RAS and WAS pump station," which he agreed was necessary to complete Phase 2 of the project. Ballengee said he formulated an estimate using software called WinEst, which calculates labor and material costs using information from previous jobs and market prices. The software also adjusts for geographical cost differences. Using plans and specifications provided by Hibbs, Ballengee provided an estimate of $10,275,000 in 2017. In January of 2021, Ballengee updated his estimate to $9,072,729 to reflect current market prices and adjustments to the plans provided by Hibbs.

Hibbs stated that Ballengee's estimate was a "Class 1" estimate as defined by AACE International (the Association for the Advancement of Cost Engineering), meaning it is based on "90 percent, or in this particular case, 100 percent, drawings and technical specifications" and is "the best estimate that you can do without bidding the project." He stated that, in explaining the scope of work necessary to complete Phase 2 to Ballengee, he excluded "clarifier equipment" which had already been procured by Graham and placed at the project site.

35

Graham argues that Ballengee's testimony was insufficient to support the amount of the award. It notes that Ballengee acknowledged that he did not perform a site inspection and that he relied entirely on Hibbs's information regarding material costs for the construction of clarifiers. It argues that neither Ballengee nor Hibbs explained "that the steps Hibbs outlined to complete Phase 2 provided the most reasonable or efficient means of completing Phase 2" or "that Ballengee's estimate of the costs of fulfilling that plan was reasonable."

Graham cites *McGinty*, in which the Texas Supreme Court held that insufficient evidence was presented to show the reasonableness of the amount of remedial damages. 372 S.W.3d at 627–28. There, the appellee's expert testimony

> was the only evidence offered on reasonable remedial damages. He derived his estimated costs of repair from an "Exactimate" program "that's used widely in the insurance industry." The program had a Houston price guide, which he compared with Corpus Christi and found to be "within a percent or two difference." He further testified that because not every price issued by the program is right, "we have to cross-reference and double check all our pricing." And finally, he testified that "some of the other costs came from subcontractors or historical data or jobs."

*Id.* at 627. However, neither the "expert nor any other witness testified to the reasonableness of the estimated cost." *Id.* at 628. Though the appellee noted that "his expert testified extensively about how he derived his pricing estimate," the supreme court stated:

> That explanation may explain how the figure was derived, but it does not in itself make the figure reasonable. In some cases, the process will reveal factors that were considered to ensure the reasonableness of the ultimate price. But that did not happen here. Hennen's expert established only that some of the pricing came from a widely used software program and some from "subcontractors or historical data or jobs." We agree . . . that this evidence does not support the jury's finding that the estimated cost of repair was reasonable.

*Id.*

36

In response, the City argues that *McGinty* is distinguishable because "[b]oth Hibbs and Ballengee testified that the costs to complete were reasonable and necessary." We agree.[13] After Ballengee described what Hibbs asked him to do in this case, he was then asked whether he "in fact provide[d] an estimate as to the reasonable and necessary cost to construct" Phase 2, and Ballengee replied, "Yes." Ballengee proceeded to discuss the details of his estimate. Hibbs confirmed that Ballengee's 2021 estimate represented Ballengee's opinion as to the "reasonable and necessary" costs to complete Phase 2. Graham does not contest the qualifications of Ballengee or Hibbs to provide expert testimony in this regard. *See* TEX. R. EVID. 702.

Considering the foregoing, we conclude the evidence was legally and factually sufficient to support the trial court's award of $9,321,211.59 in damages to the City for the costs to complete Phase 2 of the project. We overrule this sub-issue and Graham's first issue.

## B.    Liquidated Delay Damages

The City contends by its first cross-issue that the trial court erred by failing to award the City liquidated damages under Paragraph 4.03(A) of the contract.[14] The City had the burden to prove its entitlement to liquidated damages at trial; thus, to obtain reversal, the

---

[13] The City also contends that "WinEst calculates the cost based on inputs of takeoffs and quantities surveys underlying current material and labor cost data, easily distinguishing this case from the use of the 'Xactimate' [sic] software" discussed in *McGinty*. *See McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012). We note that, although the software at issue in *McGinty* apparently did not consider historical data from other jobs or local price differences in producing its estimates, the expert in that case testified that he took those factors into account, and the Court still held the evidence insufficient. *See id.* at 628.

[14] Graham contends the City failed to preserve this issue for appellate review because it never complained to the trial court about its failure to award liquidated damages. However, in a civil bench trial, a complaint about inadequate damages may be made for the first time on appeal. TEX. R. APP. P. 33.1(d).

City must show on appeal that the evidence established its entitlement to such damages as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241.

As noted, the court found that Graham's obligation to substantially complete Phase 1 before October 20, 2012, was excused, and that Graham achieved substantial completion of Phase 1 some 692 days later, on September 12, 2014. The court separately found that Graham was entitled to damages for 392 days of "[City]-caused compensable delays" and an additional 85 calendar days of pile testing delays, for a total of 477 days. However, the trial court concluded that the City is not entitled to liquidated damages under Paragraph 4.03(A), even though it took longer than 477 days after October 20, 2012, for Graham to substantially complete Phase 1. The City argues that, under Paragraph 4.03(A), it was entitled to liquidated damages of $2,600 per day for 215 days, representing the additional time beyond 477 days which Graham took to achieve substantial completion, because there was "no evidence of excuse" for those additional days.[15]

We agree with the City that the trial court's fact findings do not support its conclusion regarding liquidated damages. *See* TEX. R. CIV. P. 299 ("When findings of fact are sent by the trial court they must form the basis of the judgment upon all grounds of recovery and of defense embraced therein."); *see also Yazdani-Beioky v. Sharifan*, 550 S.W.3d 808, 822 (Tex. App.—Houston [14th Dist.] 2018, pet. denied) ("Where findings of fact cannot be reconciled with conclusions of law, findings of fact will be deemed to control.").

---

[15] In its initial brief, the City emphasizes that, under the contract, any change to the price above $50,000 "must be approved by the City Council," and it suggests that, because "no individual City representative ha[d] actual or apparent authority to waive Graham's strict compliance with any Contract term," there was "no way" for the City to "relieve Graham of contract obligations." However, it does not appear to dispute the sufficiency of the evidence to support the trial court's finding that Graham was excused from complying with the original October 20, 2012 deadline for at least 477 days.

We first note that the court's finding that Graham was *entitled to damages* for only 477 days of City-caused compensable delays does not necessarily imply that Graham's *time extension*—i.e., the time after the original completion date within which Graham could achieve substantial completion without owing delay damages under Paragraph 4.03(A)—was limited to those 477 days. Indeed, Section 1.22(A) of "Specification 01324A" set forth four categories of delays, two of which—"excusable delay" and "concurrent delay"—would entitle Graham to a time extension but no delay damages. Hypothetically, then, the City would not be entitled to liquidated damages if the court found, based on the evidence, that the additional 215 days were the result of "excusable delay" or "concurrent delay." But the trial court did not make such a finding. Moreover, Graham does not point to any evidence in the record establishing that there were, in fact, 215 days of "excusable delay" or "concurrent delay"—beyond the 477 days of compensable delay found by the court—which would have enlarged Graham's time extension but not entitled it to any damages. Therefore, we cannot presume the trial court found 215 days of "excusable" or "concurrent" delay. *Cf. id.* ("The judgment may not be supported upon appeal by a presumed finding upon any ground of recovery or defense, no element of which has been included in the findings of fact; but when one or more elements thereof have been found by the trial court, omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the judgment.").

Graham next contends that, even if the City was entitled to liquidated damages under Paragraph 4.03(A), that provision is unenforceable because there was no proof that the City suffered actual damages as a result of the delay. For a liquidated damages clause to be enforceable, (1) the harm caused by the breach must be "incapable or difficult

of estimation," and (2) the amount of liquidated damages called for must be "a reasonable forecast of just compensation." *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991); *see Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952) (observing that damages for breach of contract are limited to "just compensation for the loss or damage actually sustained"); *Atrium Med. Ctr., LP v. Hous. Red C LLC*, 595 S.W.3d 188, 192 (Tex. 2020) ("A damages provision that violates the rule of just compensation . . . and functions as a penalty, is unenforceable."). "[T]o show that a liquidated damages provision is unreasonable because the actual damages incurred were much less than the amount contracted for, a defendant may be required to prove what the actual damages were." *Phillips*, 820 S.W.2d at 788; *see FPL Energy, LLC v. TXU Portfolio Mgmt. Co.*, 426 S.W.3d 59, 72 (Tex. 2014) ("[W]hen there is an unbridgeable discrepancy between liquidated damages provisions as written and the unfortunate reality in application, we cannot enforce such provisions.").

Graham itself did not produce any evidence regarding the City's actual damages suffered as a result of unexcused delays in substantially completing Phase 1, and it points to no such evidence in the record on appeal. *See Atrium Med. Ctr.*, 595 S.W.3d at 198. ("[W]hen a liquidated damages provision is facially reasonable, the breaching party must present evidence from which the court may find that an 'unbridgeable discrepancy' exists between actual and liquidated damages."). Hibbs testified that the City's "non-liquidated" damages for "construction management and related costs" was $3,226,539.19, which is far more than the amount the City now seeks in liquidated damages. Given this record, we cannot conclude that Paragraph 4.03(A) is unenforceable or violates the rule of just compensation. *See Phillips*, 820 S.W.2d at 788; *Stewart*, 245 S.W.2d at 486.

For the foregoing reasons, we conclude that the City established its entitlement to 215 days of liquidated delay damages under Paragraph 4.03(A) as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241. The City's first cross-issue is sustained.

## IV.    GRAHAM'S CLAIMS

### A.    Delay-Related Damages

By its second issue, Graham argues the trial court "failed to properly compensate" it for its "delay-related damages" because: (1) the evidence conclusively showed Graham suffered "lost productivity" damages resulting from City-caused delays; (2) the trial court's refusal to award amounts for "generator conflicts and other direct costs" conflicted with undisputed trial evidence; and (3) the award of only 477 days of overhead conflicted with undisputed trial evidence. Again, because Graham bore the burden of proof at trial on these claims, it must show on appeal that "the evidence establishes, as a matter of law, all vital facts in support of the issue." *See id.*

### 1.    Lost Productivity and Generator Conflict

As noted, the trial court found that "Graham failed to prove its alleged loss of productivity and impact claims." Graham argues that the evidence conclusively established that it suffered at least some lost productivity and impact damages due to the City's demand for "unwarranted and time-consuming testing" on piles which Graham had installed on the project. *See Net Constr., Inc. v. C & C Rehab & Constr., Inc.*, 256 F. Supp. 2d 350, 354 (E.D. Pa. 2003) ("A claim of lost productivity is a claim arising out of a delay of a construction project that causes a contractor to alter its method of performance so as to proceed in a less productive manner; the contractor may claim its inefficiency as a delay damage."); *County of Galveston v. Triple B Servs., LLP*, 498 S.W.3d 176, 181–82

41

(Tex. App.—Houston [1st Dist.] 2016, pet. denied) ("Disruption damages . . . are for a project that may be timely completed but nevertheless includes disruption to the contractor and compensates it for a reduction in the expected productivity of labor and equipment—a loss of efficiency measured in reduced production of units of work within a given period of time. . . . A project that finishes on time but at greater expense because of disruptive events or scheduling errors presents a claim for disruption damages." (internal citations omitted)).

Greg Ritke, Graham's Vice President of Operations, testified that the pile testing issues caused the project to run behind schedule almost from the beginning and forced Graham to incur additional labor costs to make up for lost time. He stated that the hiring and training of extra workers, which was necessary due to the delays, also detrimentally affected Graham's productivity. Ritke and Graham's project superintendent, Patrick Phelps, testified that the pile testing delays caused inefficiencies resulting from changes in scheduling and reassignment of workers. Graham's witnesses also testified that the delays caused workers to incur excessive overtime, caused a shortage of supervisor availability, and caused subcontractors from several different trades to work in the same space concurrently, which damaged efficiency.

Bill Corn, an expert witness retained by Graham, stated that excessive overtime "lowers work output and efficiency through physical fatigue and poor mental attitude," especially when the amount of overtime required is over ten or twenty percent of the regular time. Corn stated that he visited the site, analyzed the construction schedule, reviewed "cost reports" and payroll information, and studied the plans and specifications for the project. To determine the precise amount of lost productivity damages, Corn

referred to factors formulated by the Mechanical Contractors Association of America (MCAA). *See JH Kelly, LLC v. AECOM Tech. Servs., Inc.*, 605 F. Supp. 3d 1295, 1312 (N.D. Cal. 2022) (noting that an "MCAA factors" analysis "proceeds in two steps. First, there are 16 factors recognized by mechanical industry observers as being harmful to labor productivity, like crew size inefficiency, fatigue, or season and weather change. Aligned against those factors are three degrees of severity: minor, average, and severe. MCAA factors analysis consists of matching an impact with the appropriate severity level and applying that figure to labor hours to estimate project disruption."). Assigning discrete sums to six of those factors—reassignment of manpower, concurrent operations, dilution of supervision, learning curve, fatigue, and overtime—Corn opined that Graham suffered a total of $4,431,325 in lost productivity damages.

The trial court stated in its findings of fact that "Corn's testimony on lost productivity was neither credible nor reliable." It noted that Corn applied each MCAA factor to all of the delay-related claims made by Graham together—i.e., those referred to in the court's conclusions of law as items "a" through "k"—but the court did not award damages for all of those specific claims; thus, because Corn did not provide a "claim-by-claim breakdown," the trial court stated it "is left to guess, what, if any, damages Graham may be entitled to" for lost productivity. The trial court stated: "If the Court agreed on one or some claims and one or some factors and disagreed on others, the Court is left to speculate since Mr. Corn did not provide a reliable methodology for the Court to follow for any individual claim." The court also stated that Corn's "assignment of a percentage he applied to each category was speculative."

Also by this issue, Graham challenges the trial court's finding that "Graham did not prove any compensable time or direct cost damages for its claims related to the generator, item 'g.'" Graham argues that the undisputed evidence shows that, due to the pile testing delays caused by the City, Graham was forced to modify its designs for the installation of generators, causing it to suffer damages.

Graham acknowledges that the trier of fact generally has discretion to award damages within the range of evidence presented at trial. *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 566 (Tex. 2002). However, it argues that, because it "established the fact of its lost productivity damages," the trial court was without discretion to award zero for that category. *See McKnight v. Hill & Hill Exterminators, Inc.*, 689 S.W.2d 206, 207 (Tex. 1985) ("Uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery."); *Vance v. My Apartment Steak House of San Antonio, Inc.*, 677 S.W.2d 480, 484 (Tex. 1984) ("If an injured party has produced the best evidence available, and if it is sufficient to afford a reasonable basis for determining his loss, he is not to be denied a recovery because the exact amount of the damage is incapable of ascertainment."). It further contends that "[t]here is no valid basis for the court's supposed concern" with the reliability or speculative nature of Corn's testimony. It argues that it would have been impossible for Corn to "segregate the particular productivity losses relating to one kind of claim from another" because of the "pervasive nature of those changes and the fact that many of them overlapped in time." And it observes that Corn's testimony regarding percentages applied to each category was consistent with the MCAA guidelines, which provide for "three levels of impact: Minor,

44

Average, and Severe, with a percent of loss assigned to each category for each level of impact." *See JH Kelly, LLC*, 605 F. Supp. 3d at 1312.

In response, the City points to the trial court's finding that the "delays caused by the anomalies in some of the piles were outside the control of Graham and the City." The City contends that the trial court's decision to award zero loss-of-productivity damages is supported by this finding—which Graham does not challenge on appeal—because it negates the causation element of Graham's breach claim. *See USAA Tex. Lloyds Co.*, 545 S.W.3d at 501 n.21. We agree.[16] All of the loss-of-productivity claims made by Graham arise from delays necessitated by the pile testing, which, as the trial court found, "caused a domino impact effect on Graham as all the critical paths of the Project ran through the piles." Although Carollo determined that Graham was entitled to an additional 82 working days of schedule relief related to the pile testing delays, this determination is consistent with an "excusable delay" or "concurrent delay" as defined in the contract and does not itself indicate that the City proximately caused the delay so as to support Graham's claim. Accordingly, regardless of whether the trial court was within its discretion in disregarding Corn's testimony, and regardless of what the evidence showed with regard to the generator conflicts, we cannot conclude that the evidence established Graham's loss-of-productivity damages as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241.

We overrule this part of Graham's second issue.

---

[16] The City also observes that "[n]o Texas court has approved use of MCAA factors to calculate lost labor productivity in any context." Given our disposition, we need not decide here whether the factors are applicable in this context. *See* TEX. R. APP. P. 47.1.

## 2.    Pile Testing Delays

Both parties challenge the trial court's conclusion that Graham was entitled to damages of $5,862 per day for 85 additional days of delays related to pile testing. By part of its second issue, Graham argues the undisputed evidence showed it was entitled to an additional twenty-nine days. By its second issue on cross-appeal, the City argues the entire award was erroneous.

We address the City's issue first because it is dispositive. The City argues that Graham was not entitled to any delay damages related to the pile testing because of the following provision contained in the "General and Supplemental Conditions":

> 12.05  *Delays Beyond [the City's] and [Graham's] Control*
>
> A       Where [Graham] is prevented from completing any part of the Work within the Contract Times (or Milestones) due to delay beyond the control of both [the City] and [Graham], an extension of the Contract Times (or Milestones) in an amount equal to the time lost due to such delay shall be [Graham]'s sole and exclusive remedy for such delay.

The City notes that Section 1.22(A) of "Specification 01324A" mandates the same result. It contends that, due to the trial court's finding "that the delays caused by the anomalies in some of the piles were outside the control of Graham and the City," the award of delay damages to Graham is barred by these contractual provisions.

> In response, Graham argues that the City
>
> conflates the delays relating to the *anomalies* in some of the piles (which the trial court found were outside the control of Graham and the City) with the delays relating to the subsequent *testing and approval* of the piles (for which the trial court correctly awarded Graham damages because this delay was the sole responsibility of the City and Carollo, the Owner's Representati[ve]).

It further notes that, although the court found that the delays "caused by the anomalies in some of the piles" were beyond the control of the City, it also concluded that Graham was

46

entitled to damages for "85 calendar days" of delay attributable to the pile anomalies. However, as the City observes, findings of fact control over conclusions of law when the two conflict. *See Yazdani-Beioky*, 550 S.W.3d at 822; *see also* TEX. R. CIV. P. 299.

We agree with the City that the conclusion is not supported by the findings. *See* TEX. R. CIV. P. 299. The record does not support Graham's assertion that the trial court drew a distinction between (1) delays caused by the anomalies and (2) delays caused by "testing and approval" of the piles after the anomalies had been discovered. Indeed, there is no dispute that the testing of the piles was undertaken only because the anomalies were discovered; therefore, a plain reading of "delays caused by the anomalies" would include delays caused by testing. Moreover, in its findings and conclusions, the court used the term "delays caused by the anomalies" interchangeably with the term "pile testing delays," strongly indicating it did not perceive a difference between the two.

Because the trial court's conclusion that Graham was entitled to "85 calendar days at $5,862.00 per day" in damages pertaining to the pile testing is not supported by its fact findings, we conclude that the trial court erred in awarding $498,270 to Graham on this claim.[17] The City's second issue on cross-appeal is sustained.

## B.    Attorney's Fees

By its third cross-issue, the City contends that the trial court erred in awarding attorney's fees to Graham. It notes that, in its live petition, Graham cited § 271.153(a) of the local government code as a basis for fee recovery; however, the City argues that this statute "only waives immunity from suit for attorney's fees" and "does not in-and-of-itself

---

[17] In light of this conclusion, we need not address that part of Graham's second issue arguing that it was entitled to an additional twenty-nine days of damages relating to the pile testing delays. *See id.*

47

form a substantive basis" for the award of attorney's fees. *See* TEX. LOC. GOV'T CODE ANN. § 271.153(a)(3) (stating that "the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter is limited to," among other things, "reasonable and necessary attorney's fees that are equitable and just"). The City cites *County of Galveston v. Triple B Services, LLP*, in which the First District Court of Appeals held that a different statute containing identical language "does not serve as a substantive basis for attorney's fees; it only allows attorney's fees if another statute—or the contract—allows attorney's fees." 498 S.W.3d at 189 (construing TEX. LOC. GOV'T CODE ANN. § 262.007(b)(3)).

In the 2020 appeal, the City argued that it was immune to Graham's attorney's fees claim because "§ 271.153 only acts a limitation on recoverable damages" and "does not act as an independent legal basis for recovering attorney's fees." *Graham*, 2020 WL 3478661, at *5. We noted that the statute "does not state that attorney's fees are only recoverable under the Act as authorized under other statutes. Rather, it generally states that reasonable and just attorney's fees are recoverable." *Id.* (citing TEX. LOC. GOV'T CODE ANN. § 271.153(a)(3)). We therefore held that "Graham has alleged a claim for attorney's fees under § 271.153 for which the City has waived its immunity." *See id.* (first citing *City of Pearsall v. Tobias*, 533 S.W.3d 516, 527 (Tex. App.—San Antonio 2017, pet. denied) ("Because Tobias's pleadings state a claim under [§] 271.152, we likewise conclude Tobias's pleadings also allege a claim for attorney's fees under [§] 271.153 for which the City of Pearsall waived its immunity."); and then citing *Dallas/Fort Worth Int'l Airport Bd. v. INET Airport Sys., Inc.*, No. 4:13-CV-753-A, 2017 WL 4221077, at *4–6 (N.D. Tex. Sept.

21, 2017) (mem. op. and order) (rejecting the argument that "attorney's fees may only be awarded [under § 271.153] . . . if another statutory provision authorizes the award")).

Graham argues that our remark in 2020 that § 271.153 "generally states that reasonable and just attorney's fees are recoverable" constitutes the law of the case which we may not revisit. *See Graham*, 2020 WL 3478661, at *5; *see also Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986) ("By narrowing the issues in successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency."). On the other hand, the City argues that our suggestion in 2020 that § 271.153(a)(3) provides an independent basis for the recovery of fees was dicta, and that we should instead follow *County of Galveston*.

We assume but do not decide that the City is correct that (1) § 271.153(a)(3) does not itself provide an "independent legal basis" for the recovery of fees, and (2) our 2020 statement to the contrary was non-binding dicta. Nevertheless, we conclude that the award of fees to Graham was supported by the record.

"As a general rule, litigants in Texas are responsible for their own attorney's fees and expenses in litigation." *Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 41 (Tex. 2012). Attorney's fees are recoverable only when provided for by statute or the parties' contract. *Tony Gullo Motors I, L.P.*, 212 S.W.3d at 310. Graham's live pleading alleged the following, in relevant part:

> Pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code, Graham seeks a declaration of the rights of the City and Graham as to their obligations under the Contract. More specifically, Graham seeks a declaration that the Correction Period from the Contract has expired and that Graham is not obligated under the Contract to perform the work requested in the October 2016 punch list from FNI and/or the work identified in the City's October 17, 2016 letter. Graham further seeks recovery of its

49

attorney's fees as allowed by Section 37.009 of the Texas Civil Practice & Remedies Code.

. . . .

Upon judgment being rendered herein, Graham is entitled to collect and hereby sues to recover its reasonable and necessary attorney's fees and expenses at the trial court, and on appeal if necessary, as are equitable and just, under Section 271.153(a)(3) of the Texas Local Government Code, as authorized under Section 2251.043 of the Texas Government Code, as allowed by Section 37.009 of the Texas Civil Practice & Remedies Code, and as provided for under the Contract.

Section 37.009 of the civil practice and remedies code, part of the Uniform Declaratory Judgments Act (UDJA), provides that "[i]n any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. It is undisputed that this lawsuit constitutes a "proceeding under [the UDJA]" and that the amount of fees awarded to Graham was "reasonable," "necessary," "equitable[,] and just."[18] *See id.* Accordingly, § 37.009 constitutes an "independent legal basis" for the award of fees and supports the trial court's award of fees to Graham under § 271.153(a)(3).

The City's third cross-issue is overruled.

## V.    CONCLUSION

We reverse that part of the trial court's judgment declining to award the City liquidated damages under Paragraph 4.03(A) of the contract, and we render judgment awarding the City 215 days of liquidated delay damages at $2,600 per day, for a total of

---

[18] The City argues that Graham could not recover fees under Texas Local Government Code § 2251.043 because Graham was not the "prevailing party" in the suit. *See* TEX. LOC. GOV'T CODE ANN. § 2251.043 ("In a formal administrative or judicial action to collect an invoice payment or interest due under [the Prompt Payment Act], the opposing party, which may be the governmental entity or the vendor, shall pay the reasonable attorney fees of the prevailing party."). In contrast, § 37.009 does not state the trial court may only award fees to the prevailing party. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009.

$559,000. Further, we reverse that part of the trial court's judgment awarding Graham $498,270 for "85 calendar days" of delay damages related to pile testing, and we render judgment that Graham take nothing by way of its request in that regard. The remainder of the judgment is affirmed.

DORI CONTRERAS<br>
Chief Justice

Delivered and filed on the
7th day of November, 2024.